UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| RAFAEL LAGUNAS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 3:24-cv-00067-RLY-CSW |
| | ) |
| OLD NATIONAL BANK, | ) |
| | ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION ON DEFENDANT'S
MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**

This matter is before the Honorable Crystal S. Wildeman, United States Magistrate Judge, pursuant to an Entry Referring Motion to Magistrate Judge, to issue a report and recommendation regarding the appropriate outcome of this motion. (Dkt. 19). Defendant, Old National Bank ("ONB") filed its *Motion to Compel Arbitration and Stay Further Proceedings*. (Dkt. 15). For the following reasons, the Magistrate Judge recommends **GRANTING** Defendant's motion, Dkt. 15, and **STAYING** this action pending the completion of arbitration.

**I.    BACKGROUND**

This case concerns a dispute between Plaintiff, Rafael Lagunas, and Defendant, Old National Bank ("ONB"), over an $11.00 Return Deposited Item Chargeback fee ("Chargeback fee"). (Dkt. 1). Mr. Lagunas contends that the Chargeback fee is unlawful. He argues that he should be permitted to contest the Chargeback fee on behalf of other people in the same boat, so to speak, and thus filed his complaint as a class action complaint. (Dkt. 1). ONB contends that the terms and conditions of the account require arbitration of all disputes with customers. Mr. Lagunas contends that he never expressly agreed to any such terms

and conditions, and that ONB has no proof of his assent. ONB has sought a stay of this federal court case to argue the case at arbitration.

In 2019, Mr. Lagunas opened a deposit account with First Midwest Bank ("FMB"). (Dkt. 16-1). As part of the process for opening an account with FMB, Mr. Lagunas signed an FMB account signature card agreeing to the terms and conditions of the deposit account agreement. (Dkts. 16-1, 16-2). In February 2022, FMB merged into ONB. (Dkt. 16-1) In July of 2022, ONB began to convert then existing FMB accounts into ONB accounts. (Id.). As part of the account conversion, ONB sent all FMB account holders, including Mr. Lagunas, a welcome packet that included ONB's then existing Deposit Account Agreement and Disclosure ("2022 DAA"). (Id.). The 2022 DAA informed FMB customers that the deposit agreement would govern each customer's account after the merger. (Dkt. 16-3). Section 10.1 2022 DAA contained the following arbitration provision:

> This Agreement contains an arbitration provision under which you and Old National agree that any dispute under this Agreement or related to your Account or our relationship with you will be resolved in binding arbitration, and that you will not have the right to a jury trial or to resolve the dispute in court.

(Id.). The Arbitration Agreement also explained how to resolve a formal dispute, defined which disputes were subject to arbitration, outlined the arbitration procedure, and addressed the cost of arbitration. Clauses concerning severability, survival, and a class action and jury trial waiver are were included in Section 10. (Id.). The 2022 DAA further stated that by "using any of [ONB's] deposit Account services (including electronic submission, execution, and use), [customers] agree to be bound by this Agreement." Mr. Lagunas' account was converted from FMB to ONB around July 11, 2022. (Dkt. 16-1).

In the summer of 2023, ONB updated the terms of its deposit agreement and informed customers that a new agreement ("2023 DAA" or "DAA") would go into effect on August 1, 2023. (Id.). The 2023 DAA contained identical arbitration language to that in Section 10 in a new Section 11. (Dkts. 16-1, 16-5). On August

22, 2023, ONB sent a letter to Mr. Lagunas to his address of record, notifying him of the changes. (Dkt. 16-4).

A little more than one year after ONB converted the old FMB accounts, Mr. Lagunas deposited the check at issue in this case into his ONB account. (Dkt. 1). Later that same day, ONB notified him that the deposited check was returned, and that ONB had charged him a fee of $11.00 for a Return Deposited Item ("Chargeback fee"). (*Id.*). Pursuant to Section 4.9 of the 2023 DAA, ONB charges customers a Chargeback fee for any checks that are returned to ONB as unpaid. (Dkt. 16-5). Section 4.9 specifically provides:

> If [ONB] cash[es] a check for you or accept[s] any Item for deposit to your Account and it is later returned to the Bank unpaid (a "Chargeback"), [ONB] will charge you a fee and debit your Account for the amount of the Chargeback.

(*Id.*).

On April 4, 2024, Mr. Lagunas filed a putative class action against ONB alleging (1) breach of the implied covenant of good faith and fair dealing, (2) unjust enrichment, and (3) violation of Illinois Consumer Fraud and Deceptive Business Practices Act. (Dkt 1). In response, ONB argues the 2023 DAA's arbitration provision mandates arbitration of the dispute and therefore, ONB filed its Motion to Compel Arbitration and Stay Further Proceedings. (Dkt 15). Mr. Lagunas claims that after the merger between FMB and ONB, he never received or reviewed a copy of the 2022 or 2023 DAA, and therefore, he should not be subject to the terms of the DAA. (Dkt. 17-1).

II. **LEGAL STANDARD**

In 1925, Congress enacted the Federal Arbitration Act ("FAA") in response to "widespread judicial hostility to arbitration." *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 232 (2013). Section 2 of the FAA provides:

> A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable,

and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.  Thus, arbitration is a matter of contract.  *Am. Exp.*, 570 U.S. at 233.  Consistent with this principle, courts must place arbitration agreements "on an equal footing with other contracts . . . and enforce them according to their terms." *AT&T Mobility LLC v. Conception*, 563 U.S. 333, 339 (2011).

A party seeking to compel arbitration must show (1) a valid agreement to arbitrate, (2) the dispute is within the scope of arbitration, and (3) the opposing party refuses to proceed to arbitration.  *Kass v. PayPal Inc.*, 75 F.4th 693, 700 (7th Cir. 2023).  Arbitration can only be compelled when the court is "satisfied that the parties agreed to arbitrate *that dispute.*"  *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010) (emphasis in original); *United Nat. Foods, Inc. v. Teamsters Loc 414*, 58 F.4th 927, 933 (7th Cir. 2023).  Whether a valid arbitration agreement exists is a matter of state contract law.  *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 733 (7th Cir. 2002).

If the moving party establishes that there is a valid arbitration agreement, the FAA creates a strong presumption that arbitration "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  *AT&T Techs., Inc. v. Commc'n Workers of Am.*, 475 U.S. 643, 650 (1986) (internal quotations omitted).  Any doubt concerning the arbitration "should be resolved in favor of coverage."  *Id.*  This presumption is especially applicable when the arbitration clause is broad.  *See id.*  Only the "most forceful evidence" to exclude a claim from arbitration will prevail.  *Id.*

## III. ANALYSIS

The main issue here is whether a valid agreement to arbitrate exists.[1]  ONB argues that Mr. Lagunas entered into a valid contract when he opened his bank

---

[1] Mr. Lagunas concedes that "if a valid arbitration agreement exist[s], [his] claims in this matter would fall within the scope of [the] arbitration agreement."  (Dkt. 17 at 9 n.2).

account and that through continued use of the account, Mr. Lagunas agreed to the terms of the DAA.  (Dkt. 16).  Mr. Lagunas argues that despite opening the bank account and actively depositing funds, he never expressly agreed to the terms and conditions of the DAA, and he was never notified that the terms of the DAA applied to him.  (Dkt. 17).  In response, ONB reiterates its argument that Mr. Lagunas cannot avoid arbitration of his claims because his account activity constitutes assent to the terms of the DAA.  (Dkt. 18).

        A.      **Mr. Lagunas' notice and assent to the DAA**

Mr. Lagunas first argues that ONB lacks evidence to show that he assented to the terms of the DAA; specifically, he denies that he received notice regarding terms of the account.  (Dkt. 17).  This is a question of contract formation, meaning, does a contract exist?  To answer this question, we must look to applicable state law.  *Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 710-11 (7th Cir. 2019).  Here, both parties agree that Indiana state law governs.  (Dkts. 16 at 8, 17 at 4).

Arbitration agreements are considered contracts.  *Rodgers-Rouzier v. Am. Queen Steamboat Opperating Co., LLC*, 104 F.4th 978, 991 (7th Cir. 2024).  Under Indiana contract law, the party seeking to compel arbitration bears the burden of demonstrating the existence of an enforceable arbitration agreement.  *Watts Water Techs., Inc. v. State Farm Fire & Ca. Co.*, 66 N.E.3d 983, 989 (Ind. Ct. App. 2016).  An arbitration agreement – like an enforceable contract – requires an offer, acceptance, consideration.  *Land v. IU Credit Union*, 218 N.E.3d 1282, 1287 (Ind. 2023).  Assent to the contract may be demonstrated by acts.  *Nationwide Ins. Co. v. Heck*, 873 N.E.2d 190, 196 n.1 (Ind. Ct. App. 2007).[2]

Mr. Lagunas brought this lawsuit against ONB for charging him what he alleges is an unlawful Chargeback fee.  (Dkt. 1).  In his Complaint, Mr. Lagunas

---

[2] "Unlike implied in law or quasi-contracts, which do not arise from the parties' express agreement but which are implied by law to remedy a party's wrongful enrichment, a contract implied in fact arises out of acts and conduct of the parties, coupled with a meeting of the minds and a clear intent of the parties in the agreement." *Nationwide*, 873 N.E.2d at 196 n.1.

states that when opening a deposit account with ONB, "each customer receives a comprehensive 'Deposit Account Agreement and Disclosure' . . . which — along with the schedule of fees — forms a contract between [ONB] and the customer and provides the terms and conditions governing each deposit account held with Old National."[3] (*Id.* at ¶ 20).  This statement is confirmed by ONB's Deposit Services Supervisor, Brandy Greer.  (Dkt. 16-1).  In her statement, Ms. Greer confirms that Mr. Lagunas opened his deposit account originally with FMB and signed an acknowledgement that he would be bound by the terms and conditions that were applicable to his account.  (*Id.* at ¶ 5; Dkt. 16-2).

ONB correctly points out—and Mr. Lagunas does not deny—that he held an ONB deposit account during the applicable period.  The facts also show that Mr. Lagunas (1) knowingly accepted ONB's offer to transfer his account to ONB in 2022, (2) received a deposit agreement per the admission in his Complaint, and (3) continued to use his account for nearly two years.  *See Kinkle v. Equifax Info. Servs., LLC*, 2023 WL 4105804, at *3 (S.D. Ind. June 21, 2023) (finding existence of valid and enforceable arbitration agreement where plaintiff assented to the terms of the agreement by enrolling in defendant's service).  The undersigned finds Mr. Lagunas' arguments on notice unavailing, especially when considering he continued to use his ONB account and admits knowing that account was subject to terms, as verified by the admissions contained in his Complaint.

The facts presented in this case resemble the facts in *Mines v. Galaxy Int'l Purchasing, LLC*.  No. 1:17-cv-04746-RLY-DLP, 2019 WL 1318277, at *1 (S.D. Ind. March 6, 2019).[4]  There, the plaintiff, Mr. Mines, applied for an online credit card with Mid-America Bank & Trust Company.  *Id.*  As part of the pre-qualification application, Mr. Mines received the terms and conditions of the credit card which

---

[3] "Facts alleged in pleadings are judicial admissions and are binding on the party making them." *Spierer v. Rossman*, 2014 WL 4908023, at *10 (S.D. Ind. Sept. 30, 2014) (citing *Soo Line R.R. Co. v. St. Louis Sw. Ry. Co.*, 125 F.3d 481, 483 (7th Cir.1997)).

[4] Magistrate Judge's Report and Recommendation which was later adopted in full by the District Court Judge.  *Mines v. Galaxy Int'l Purchasing, LLC*.  No. 1:17-cv-04746-RLY-DLP, 2019 WL 1317622, *1 (March 22, 2024).

6

included an arbitration agreement.  *Id.*  After receipt of the credit card, Mr. Mines maxed out his credit limit and failed to make any payments on the account.  *Id.* at *3.  After closing Mr. Mines' account, Mid-America sold the account to Genesis BankCard Services, Inc., who in turn sold the account to the defendant, Galaxy International Purchasing, LLC.  *Id.*  After taking control of the account, Galaxy mailed a letter to Mr. Mines to collect the outstanding debt.  *Id.* at *4.  Mr. Mines brought a lawsuit against Galaxy claiming that Galaxy lacked the authority to enforce any arbitration provision applicable to his Mid-America account.  *Id.* at *5.  Mr. Mines specifically argued that "the terms of the Cardholder Agreement are not binding on [him] because the defendant failed to prove that he received the Cardholder Agreement."  *Id.*

Applying Indiana law, this Court found that Mr. Mines was on notice and subject to the terms of the agreement because of his continued use of the credit card.  *Id.* at 7 (citing *Smither v. Asset Acceptance, LLC*, 919 N.E.2d 1153, 1158 (Ind. Ct. App. 2010)).  The Court reasoned that a contract creating indebtedness is formed when the customer accepts the bank's offer by using the credit card. Additionally, the Court held that Galaxy did not need to prove that Mr. Mines actually received the Cardholder Agreement because his assent was confirmed by use of the card.  *Id.*  The Court also recognized the general rule of contracts that "contract rights are freely assignable unless the contract explicitly limits the right to assignment."  *Id.* (citing *Kuntz v. EVI, LLC*, 999 N.E.2d 425, 429 n. 5 (Ind. Ct. App. 2013)).  Based on the language of the cardholder agreement and Indiana law, Mid-America was free to assign its rights to Mr. Mines' account and the assignee also free to enforce the arbitration provision.  *Id.* at 8.

Here, Mr. Lagunas makes similar arguments to those raised and rejected in *Mines*.  *See Id.* at 5.  Mr. Lagunas argues that he never assented to the terms of the DAA.  (Dkt. 17).  He specifically claims that the terms of the arbitration agreement cannot be enforced, because ONB has failed to prove that he expressed any words or indication that constituted his assent to the contract terms.  (*Id.*).  However, Mr.

7

Lagunas admits to holding and actively using the ONB account. (Dkt. 1 at ¶¶ 26-31).

About a year after ONB acquired FMB, ONB sent an updated account agreement with language stating, "its deposit agreement [will] become effective August 1, 2023." (Dkt. 16-1). On or around September 28, 2023, Mr. Lagunas attempted to deposit checks into his ONB account. (Dkt. 1). This action is enough to establish Mr. Lagunas' willingness to assent to the 2022 and 2023 DAA and its applicable terms, including the arbitration agreement. *See Mines*, 2019 WL 1318277 at \*7.

Mr. Lagunas relies heavily on a recent Indiana Supreme Court decision to support his position that silence and inaction do not constitute acceptance. *Land v. IU Credit Union*, 218 N.E.3d at 1286. However, Mr. Lagunas' reliance is misplaced. In *Land*, the account holder was required to click an "Accept" button after receiving updated terms for her account; this, she did not do. *Id.* at 1289. The *Land* holding was based upon the language in that agreement, which required both the affirmative act of indicating "accept" in a clickthrough software *and* continued use of the account. While the *Land* court found that the appellant's continued use of her banking accounts alone did not result in acceptance to modifications of the original contract, the court did so because the account holder's agreement in that case was "conditioned [on] continued use of the accounts [**and**] acceptance of the [arbitration] Addendum." *Id.* at 1290-91. (emphasis added).

Here, ONB's language does not require both. Instead, ONB customers are on notice that simply by "using any of [ONB's] deposit Account services (including electronic submission, execution, and use), [customers] agree to be bound by [the] Agreement." (Dkts. 16-3 at 7, 16-5 at 6). Again, this language differs from that in *Land* which required an affirmative act of acceptance *and* use. *See* 218 N.E.3d at 1290-91. ONB's language requires only use for assent, and use has been held sufficient to indicate assent in Indiana. *See Meyer v. Nat'l City Bank*, 903 N.E.2d 974, 976 (Ind. Ct. App. 2009) (holding that a customer assented to a credit card

8

agreement that expressly stated that use of the card in any way constituted acceptance). (emphasis added).  Therefore, the *Land* holding is distinguishable.

Mr. Lagunas also argues that he did not receive proper notice of the 2023 DAA and its arbitration agreement.  (Dkt. 17).  However, Mr. Lagunas assented to the terms of the 2023 BAA when he deposited the checks in his account, and as such is subject to section 3.14 of the agreement.  (Dkt. 16-5 at 12).  Section 3.14 provides:

> **Notice from [ONB] to any owner of [an] Account shall constitute notice to all Account owners. All statements, notices and other communications and writings given by [ONB] in connection with an Account or this Agreement (collectively, "Notices") shall be deemed given when sent to the address we have on record for the Account or to such address designated by any owner of the Account.**

(*Id.*).  Because the language of Section 3.14 is clear as to what constitutes notice, and ONB has shown that it "sent to the address on record for the account," Mr. Lagunas is on notice pursuant to the terms of the agreement.

### B.   Claims Subject to Arbitration

The undersigned now turns to whether Plaintiff's claims are within the scope of the arbitration agreement.  Whether the dispute falls within the arbitration agreement's scope is typically "an issue for judicial determination . . . [u]nless the parties clearly and unmistakably provide otherwise."  *AT&T Techs., Inc. v. Commc'n Workers of Am.*, 475 U.S. 643, 649 (1986).

Here, the DAA contained an express disclosure set in bold disclosing the governing arbitration provision:

> **This Agreement contains an arbitration provision under which you and [ONB] agree that any dispute under this Agreement or related to your Account or our relationship with you will be resolved in binding arbitration, and that you will not have the right to a jury trial or to resolve the dispute in court.**

(Dkt. 16-5).  Section 11 of the DAA also informs customers how to resolve a formal dispute with ONB.  (*Id.*).  Specifically, Section 11.1 states:

9

> If you have a dispute with the Bank, [ONB] hope[s] to resolve it quickly and easily. First, please contact your personal banker to see if they can solve the problem. **If the dispute cannot be resolved informally, you and the Bank agree that any dispute between us will be resolved by the arbitration process described in this section.** You and the Bank each agree to waive the right to a jury trial or a trial before a judge in a public court. The only exception to this are claims that may be filed in small claims court. If your unresolved dispute is within the jurisdiction of small claims court, you should file your claim there.

(*Id.*) (emphasis added).

Section 11.2 also provides that "[a] 'dispute' is an unresolved disagreement between you and [ONB] or its agents related to [Mr. Lagunas'] Account, including but not limited to any transactions, any related product or service, this Agreement, any prior deposit account agreement with [ONB]." (*Id.*). A dispute "includes any disagreement about whether the terms of this Section 11 (the "Arbitration Agreement") are enforceable, valid, the meaning of this Arbitration Agreement, and whether a disagreement is a dispute subject to binding arbitration as provided for hereunder." (*Id.*).

The DAA's explicit language confirms that "any dispute" arising between ONB and Mr. Lagunas is subject to arbitration. Mr. Lagunas does not dispute that "each customer receives a comprehensive 'Deposit Account Agreement and Disclosure.'" (Dkt. 1 at ¶ 20). He also does not deny that he is challenging the Chargeback fee which falls under the DAA's definition of a dispute. (Dkt. 1 at ¶¶ 26-31). The explicit language in Section 11 of the DAA therefore provides that all disputes—including the one at bar—should be arbitrated.

### C. Class Action Waiver

Finally, the undersigned turns to whether Mr. Lagunas is barred from litigating his claims on a class action basis. As discussed above, "Indiana recognizes a strong policy interest in favor of enforcing arbitration agreements." *Land*, 218 N.E.3d at 1286. This policy also applies when the contract between the parties includes a class action waiver. *See Fin. Ctr. First Credit Union v. Rivera*, 178

10

N.E.3d 1245 (Ind. Ct. App. 2021) (affirming the trial court's grant of a motion to compel arbitration that contained a class action waiver); *see also Sherrat v. Jefferson Cap. Sys. LLC*, No. 23A-CC-1276, 2024 WL 1191831, at *3 (Ind. Ct. App. 2024).

Here, the record shows as already discussed herein that Mr. Lagunas assented to the terms of the DAA, which included a class action waiver. (Dkt. 16-5). In bolded text, Section 11.3 of the DAA provides:

> **YOU UNDERSTAND THAT YOU ARE WAIVING ANY RIGHT TO PARTICIPATE IN A CLASS ACTION OR REPRESENTATIVE BASIS IN COURT OR ARBITRATION. YOU AND THE BANK BOTH AGREE NOT TO SEEK TO PROCEED ON ANY CLAIM IN ARBITRATION AS A CLASS CLAIM OR CLASS ACTION OR OTHER COMPARABLE REPRESENTATIVE PROCEEDING OR SEEK TO CONSOLIDATE IN ARBITRATION ANY CLAIMS INVOLVING SEPARATE CLAIMANTS.**

(*Id.*). This language operates as an enforceable waiver of Mr. Lagunas' right to pursue his case as a class action, and therefore, his claim should proceed to arbitration on an individualized basis.

## IV.   CONCLUSION

For the foregoing reasons, the Magistrate Judge **RECOMMENDS** that the District Judge **GRANT** ONB's *Motion to Compel Arbitration and Stay Further Proceedings*, Dkt. 15. The Magistrate Judge further **RECOMMENDS** this matter be **STAYED** pending completion of arbitration.

**SO RECOMMENDED**.

Date: August 14, 2024

*Crystal S. Wildeman*
Crystal S. Wildeman
United States Magistrate Judge
Southern District of Indiana

**Distributed electronically on all ECF-registered counsel of record.**